We have five cases on the calendar this morning, a government employee case from the MSPB, three patent cases, two of them from the TTAB and one from a district court, and a case from the Court of Federal Claims that is being submitted in the briefs and therefore will not be argued. Our first case, if I pronounce it correctly, is Uribe, Maribelia Uribe v. Department of Homeland Security, 2018-14-15. Counsel, we are ready when you are. Would you pronounce your name for us, please? Teohina. Teohina. Thank you. Please proceed. Thank you. Your Honor, we are here in reference to Maribelia Uribe v. or appealing her removal from the Department of Homeland Security. Pronounce her last name one more time. Yes, sir. Uribe. Uribe. Okay, thank you. This particular case concerns several charges and specifications as to Ms. Uribe's conduct. It is a conduct case. But they are all fact-based, aren't they? And we have to give deference on facts. Well, Your Honor, let's put it this way. It's a fact that she received a letter of reprimand. However, it's also a fact that they took three years to investigate a self-inquiry. But that isn't the issue. The issue is whether the board erred in removing her when she had been found to have misused a database, allowing family to come into the United States without proper procedure, associating with people who have been engaged in criminal activity, providing inaccurate statements. These are all fact questions. Well, they're just not. Well, they are fact questions, Your Honor, but I don't believe it's that simple. That, okay, this is a fact and this is the way we're going to interpret it. There's an interpretation to that fact. But we can both see the same thing and have different opinions about it. We don't review witnesses. We can't judge demeanor. We have to give deference to the board. Yes, but there's some certain facts that we don't believe were properly applied and we don't believe really apply. For example, they want you to believe that she made all these text inquiries and that they were made. However, what has to be looked at, we believe, in order to be fair to her and to be fair to the doctrine cited in, I'm sorry, it escaped me. Let me ask you, let me help focus that, if I may. Yes, sir. What's before us is the decision of the MSPB. That's correct, Your Honor. The administrative judge is the final decision of the MSPB, of course. What did the administrative judge do wrong? Well, I think the number one... Specifically. Oh, okay. Number one, she did not apply the doctrine of stillness. A lot of these charges go back 10 years. That's where I want to focus. So your primary argument is that they waited too long to deal with these issues. Is that right? Well, not just waited too long, Your Honor. There's a lot of inconsistencies that should have been, I think, weighed by the judge. You don't really dispute the underlying facts. You say there might be mitigating circumstances, but you don't dispute that any of the things that she was charged with actually occurred, do you? I think to some degree it's disputed, but it's disputed as a loss of due process. Right. So as a matter of fact, you don't dispute that the underlying conduct occurred, correct? We dispute that some of the way it was presented, it did not occur that way. What does that mean? Well, she said, okay, she was told that she violated the text arrangements when she inquired about Castillo, Sergio Castillo. All right. What's left out is that the supervisor, Oribe's supervisor, told her to initially contact or do an inquiry, a text inquiry about Mr. Castillo. She didn't object. She didn't feel that she should recuse herself. She just did it. Then they come back and say, after she turns herself in and says, I did this in 2013 with Carolyn Perez, then they go, hey, well, wait a minute. In 2011, you also did this. I'm sorry, 2008, you also did this with Castillo. That's a fact, but I think you have to look at those particular issues also. If her supervisor told her to inquire, and she did not turn around and turn herself in as far as to recuse herself, and she's never been told that she has to recuse herself. But she conceded that it was a policy of text, right? She conceded it was a policy for personal use. And she violated that policy. She did violate it, but I don't think she violated it in Castillo's case. When your supervisor tells you, text Castillo, then that's what you do. And that's what she did. Then the issue becomes, should she have recused herself? But she knew she should have, right? She admitted she should have. Well, Your Honor, there is a section in there, and I think we brought it out in our brief, that says that she's allowed, every employee is allowed certain personal use of the text. Or any other machine in the work area. She also let relatives into the United States outside of normal procedures, did she not? She let them in. Yes. Okay, but, and she was supposed to turn herself in, or make certain arrangements to have other people let them in. But however, the agency also says, and you rode with these people. You were in the same vehicle with these people. If that's the case, she didn't let them in. She accompanied them, but she didn't let them in. Because there's another CBPO there who lets the vehicles into the United States. And I think that has to be looked at. For example, you have the proposing official. That was the job of the administrative judge, to find the facts. Court of Appeals don't find facts. I understand that, but we can argue the outcome of the administrative judge, that it may have been wrong. Or that certain things were not looked at in her decision. And we look at what the administrative judge did on a substantial evidence basis, which is an amount of evidence that a reasonable person could consider as establishing a fact. I understand. In other words, not the preponderance of the evidence, but a reasonable amount of evidence. Yes, Your Honor, but if this evidence is tainted in some way, the presentation is tainted in some way, that should be examined. Okay, so let me figure out what's tainted. You rely on a staleness argument, but you expressly waived any latches argument, at least as it relates to anything other than the Castillo inquiries, right? No, Your Honor, I didn't represent, she was represented by a union representative. All right, well, she and her union representative expressly waived any latches argument, right? I don't believe, I think that the judge brought it out, that she directly asked Mr. Rivera, are you seeking the affirmative defense of latches? And he did not answer it in the affirmative. But she still made inquiry as to whether or not latches would apply. I think she also, and I think the facts represent that, the judge actually went in and made some decisions and she actually stripped or struck some of the specifications based on latches. Assuming it's not waived. I'm sorry? Even assuming it's not waived, which I think is a difficult assumption, but even assuming that some aspect of this is not waived, what is the prejudice to her from the delay? Well, I think her Douglas factors defenses or her Douglas factor analysis was prejudiced. How so? Well, let's take the deciding official in this, I must strike that, the proposing official in his letter specifically states, I find no, 11 years you've been with us, I find no derogatory remarks in your record. Okay, but then when she goes to invest, when she goes to investigation, all of a sudden they find all these exceptions. And all I'm saying is, I understand the board's duty is to try to level the playing field, because that's what, to me, that's what MSPB is about. I may be all wrong. The board is about giving the employee a level playing field. So you're saying, just because she had never been punished in the past or reprimanded in the past, that anything that happened in the past can never be examined? No, I didn't say that. I said, when you couple that, and I put that in my brief, when you couple that with some of the conduct that she's being charged with, that clearly, Estelle, that goes back 11 years. And they even bring it up, they brought up the incidents with the self-reporting with the Pettis, Carolyn Pettis incident. They bring it up in her removal, when they had already done a letter of reprimand three years earlier. Counsel, I think you make a fair point about the long delay in some of the evidence and in this process. And I plan to ask the government about that. Thank you, Your Honor. Counsel, you're into your rebuttal time. You can continue to talk. No, I will save it. I will save it for rebuttal, Your Honor. Thank you. Ms. Kirshner. May it please the court. With regard to the allegation of that, of staleness. Of staleness. Which the court is interested in. There were four charges in this case. And staleness, if it has any implication, might have an implication with regard to the charge of misuse of the Treasury Enforcement Communications System. But the agency was not aware that she had misused this system. And what I wanted to bring out is, you can't use this for personal use. You have to have an official need to know the information for law enforcement purposes. And only in such circumstances may you use that system to get law enforcement information. And the agency... To find out about her boyfriend. In terms of her misuse with regard to the boyfriend, that was only uncovered during the course of the Office of Professional Responsibility investigation. And yes, it was a lengthy investigation. It involved two interviews. At the first interview, which was in June of 2016, she admits that she misused the Treasury Enforcement Communications System once. Only once. And she's asked specifically, is that the only time you ever did it? And she says, yes, that's the only time I ever did it. That leads to further investigation of her. And it's uncovered that she misused it with regard to the boyfriend, Mr. Castillo. And in her second interview, she's confronted with... Again, they go over this. Did you do it only once? Yes, I did it only once. Well, then they show her the documentation that she misused the Treasury Enforcement Communications System with regard to a boyfriend. And in the second interview in October of 2016, she's shown the documentation... I mean, this process takes forever. And she's left on the job to continue doing all of her duties.  that she was incapable of performing her duties. I mean, this event occurred 11 years before her discharge. And the entire investigation took, what, three or four years. And yet she's still performing her duties the whole time. And we're now supposed to believe that there's this grave belief that she was incapable of performing her duties. What the deciding official found and the board found with regard to the first charge is that she had misused her position. No Customs and Border Protection officer is allowed to go into this law enforcement database for personal... Right, but is there no factor that is considered in the Douglas factors when it says she did it once 11 years ago and she's been performing her duties since then? Certainly, you look at whether or not there's been repetition. But what the deciding official found and the board found was that she was a repeat violator. There are other types of violations, were there not? Yes, yes. With regard to the one I've just been discussing, charge one, she was a repeat violator. That's the finding of both the... But the most recent violation was 11 years before her termination. No, no. The most recent violation, I believe, was in 2013. The one with Mr. Castillo is the one that Your Honor is referring to. That is extremely old. And that was uncovered during the OPR investigation. The second charge was allowing family members and close associates entry into the United States through her primary inspection lane. And this was a continuing pattern of conduct. The violations start... But that's what's so weird about this case is that she apparently was doing this for a lengthy period of time. Where was the enforcement process back then? Well, unless there is a complaint and the Office of Personal Responsibility is alerted and then begins an investigation, frankly, misconduct is not going to be ferreted out. But in this case, there was a complaint that did lead to a lengthy investigation and additional misconduct was uncovered. Now, I think the important point is that there was no prejudice, as the Board found. She was found to have engaged in all of these forms of misconduct based on her own testimony in the two interviews that were conducted by the Office of Professional Responsibility. And there was all this documentary evidence before the judge. And based on that, he made the findings that she had indeed engaged in these four serious forms of misconduct. Why did her own self-reporting not trigger an investigation? If you say a complaint is necessary, what's wrong with self-reporting? The self-reporting was the incident back in 2013 where involving a neighbor where she went onto the system, and she self-reported that. And that's what you're supposed to do, and she did self-report it. Now, that didn't trigger anything at that time. Subsequently, when there was suspicion about why she'd want to take credit for this recovery of all these drugs, then there was a more extensive investigation of exactly what was going on. Yeah, I don't really understand that whole fact pattern. She finds out she can't open the trunk, and the driver can't seem to open the trunk, so she goes and gets help. There's nothing wrong with what she did. Right, that's what I don't understand. So this whole thing triggers this big investigation, and what she did was exactly right, right? What she did was right. Yes, that's true. In that respect. But it was right in the sense that she couldn't open the trunk, so she had somebody else assist with opening the trunk. She couldn't get it open. There was a report that it was suspicious that she didn't want to take credit for the finding of all the drugs, which, you know, the car comes into her lane, and normally the officer would be a potential witness if it ever went to... No, I think what you said is normally the officer would want to take credit so they could get a bonus. Correct, but... She didn't say she wouldn't be a potential witness. No, she just, she left. And it was a mere suspicion of misconduct at that time that triggered the investigation. But the government is allowed to do that. The government is allowed to investigate its own employees and make determinations as to whether they have engaged in any misconduct. What about the association with someone who was convicted of a crime? Yes. Her defense or her allegation there was that he was innocent. But the problem was she had misused the database and gone into the database to check on him. And the evidence in front of the judge was when you do that, you uncover the fact that he had a felony drug conviction. And the administrative judge in this case found, because she admittedly went into the database and she remembers checking on her boyfriend, she must have seen that he had a felony drug conviction. So she must have known that. And based on that, she shouldn't have continued to have this long association which goes on for years, off and on, with Mr. Castillo, which is a felony drug conviction. And in this court's decision of James v. Dale, the court pointed out that you don't want to have Customs and Border Protection officers associating with known or suspected law violators. And that's exactly what Mr. Castillo was. And then the last violation also was very serious. She gave inaccurate statements in the second interview with the Office of Professional Responsibility. And there, in particular, these relate to the use of the Treasury Enforcement Communications System. There, it was the judge's finding that she was not credible during the second interview because first, she denies having ever checked on anyone else in the system for personal reasons. And then when she's shown the documentation, she gives a vivid account of, oh, my boyfriend, I was concerned. I'm paraphrasing, Your Honor. But the exact language is in the investigation interview. And she gives a vivid description of checking into the database on her boyfriend. And based on that, the judge doesn't find that she gave correct information. She gave incorrect information during the interview. And again, in terms of the latches defense, there was no prejudice. And then also, the board judge found that there was a waiver. As we pointed out in our brief, there was a waiver at two specific times. There was a telephone conference. And at the telephone conference, her representative says that they're not asserting latches. And then later on, there is another conference on August 11th when they're supposed to state all of the defenses and latches is not raised. If the court has no further questions, the rest will be your friend. Thank you, counsel. Thank you, counsel. Mr. Tiarina. Thank you, Your Honor. Your Honor, we would first address the Carolyn Pettis or the self-reporting.  She said, I'm going to do a self-reporting. She did inquire about her neighbor. The mother comes, knocks on her door. The mother, her neighbor who lives in front of her, saying, we can't find my daughter. Can you please help me? The petitioner goes and tells her, here's the numbers you called. Call the bridge. Call the International Bridge and see what they can do for you. The mother comes back. She's going crazy. She says, I can't find my daughter. They're not helping me. Then that's when the petitioner said, well, let me see what I can do. Then she turned around and reported herself. And that is what triggered the rest of the investigation to see if she had ever used the tech system. And she just got a reprimand for that. She got a letter of reprimand. Right. And the investigation took three years on a self-reporting individual, a person who says, yes, I did it. I'm guilty. And that's it. They take three years to issue her a letter of reprimand. And like I've said before, in my opinion, it was used to stack. Here's where it was prejudiced, that it was used to stack it against her on the removal issues. Didn't she benefit from the delay by having her job longer? No, sir, it wouldn't benefit her because if it would have gone through its normal process, the collective bargaining agreement says that the letter of reprimand will stay in the employee's record for 18 months. It would have been taken out by then. They could have referred to it, but it would still have been not active. And we think that prejudiced her. The employer this time clearly violated a dozen or so articles of the collective bargaining agreement. I don't know why the union steward didn't bring it up, but that's what happened. Now, as far as the violation for the self-reporting, if you look at it and take it out of CBP Directive 51735-0118, which is what has been used against her, it specifically holds that, should a supervisor notice a pattern that indicates an employee willful negligence or disregard of CBP policy and procedures, the alleged misconduct must be reported to the Office of Internal Affairs via the Joint Intake Center or another CBP-approved method of reporting misconduct. None of that was done. None of it was done. Now, there was another issue that I wanted to address. In the removal letter, and again, I state, she went 11 years without any misconduct. That, the deciding official, Higgerson, did not speak to that. In his analysis of the Douglas factors, he only looked at, I think, one factor. You've been here 11 years. That's not really given her an equal or at least an equitable view or application of the Douglas factors. The Douglas factors, the controlling idea of the Douglas factors, are that the individual employee is given fair and equitable treatment in the application of the agency's decision. Clearly, if you take all the facts, that's not what you're gonna find. You're gonna find that the staleness of this, of the decision that the agency failed to make or figured it was not gonna have to make was prejudicial but didn't the ALJ specifically find that there were mitigating factors that they took into consideration but those mitigating factors were outweighed? Well, she didn't get all the specifications. She didn't rule on all the specifications. She dismissed a number of them, about half of them but the point is that you still have to apply the Douglas factors. You still have to apply the law. Well, which ones do you think were ignored? That was part of my brief. The, oh God, I'm sorry. If it's in your brief, we'll find it. Yes, it's in the brief. I outlined the Douglas factors specifically and went through each one and I specifically said how it was not applied. That it should have been applied. Her length of service was about the only thing that was taken into consideration and that was it. Counsel, as you can see, your red light is in the line. I'm sorry, I didn't see it. You have one final statement. Yes, Your Honor, I think that equity, like I said before, the board ends up being a court of equity. It is supposed to level the playing field. The Douglas factors are supposed to be applied. You're gonna find that the Douglas factors were not properly applied and I think that is the controlling doctrine right now is that, yes, maybe she did do some of these things and she admitted it, but on the same token, what did the agency do to prejudice her? Why did it take so long? Thank you, Counsel. We have your argument. Thank you, Your Honor. We'll take the case under advisement. Thank you.